Good morning. May it please the court, my name is Richard Lev. I represent the appellant Becton Dickinson. What we're trying to register here is not the idea of a cap that has a shield and protects the top of the tube and has a stopper inside. What we're trying to register is the particular design on the outside of the cap, the outside appearance. Here's the cap. I have a large drawing of the cap. Let me show you what I mean by what we're trying to protect in terms of the design. Can I ask a question just before we get going about sort of what the burdens were here? Because I understand it and correct me if I'm wrong, the examiner made a prima facie case of functionality and you appealed that to the board. So the burden then shifts to you to prove by a preponderance of the evidence that the examiner was wrong. And the board concluded that you failed to shoulder that burden. So the question for us is there substantial evidence to support the board's judgment that you failed to preponderate. Right. Okay. Those are the general. That's the test. Good. But I would. In terms of the design that you might call it a design, it's a mark. But which aspects of the mark are you claiming? Right. And just to follow up on what you were just saying, I think the error that the board made and the examiner made is that they were looking at the wrong thing. That's why I start off by saying is we're not trying to protect the idea of a ridges on the top. What are you trying to protect? Okay. It's very specific design. There are ridges on the outside of the cap. Can you point to the parts of the design you're trying? All right. Here in the center of the cap are ridges. And nobody disputes that ridges perform a utilitarian purpose. They give you a gripping service. But it's the specific design of the ridges that we're trying to protect. And there are very unique things about this design that we're trying to protect. If you look at the... What is specific? Okay. Some of the ridges you'll see have a triangular cross-section right over here in the center. Are those spires? Is that what they are? They are. Like spires? Yeah, like spires. They're like if you cut them through the center, you'll see a triangular cross-section. Some of the other ridges have more of a rectangular cross-section and they have a flat surface. There's no reason in terms of utility for them to be that way. They were put that way by the designer just to give it a nice appearance. There are sets of ridges. Are they in planes? I mean, for example, if you put your hands on it for gripping it, does it become easier to hold on to it if it's ridged? Oh, sure. As opposed to if it's smooth and your hand would be wet, it could slip. Right. Nobody disputes that ridges help you grip it. I think that's where the design examiner went off the tracks. They were saying, well, of course, ridges provide a utilitarian advantage. They help you grip it. Nobody disputes that. It's the particular design of the ridge and the combination of different types of ridges that our designer put into this product. Are you suggesting, though, that if you were to be granted registration for this mark, that, for example, a set of ridges that did not have the spire shape, but let's say had a curved shape at the top, would not be infringing? We'd have to look at the whole design. There are many aspects of this design, not just the ridges. I understand. Let's focus on the ridges now. Suppose that the only difference between the accused product and your mark was with respect to the shape at the top of the ridges. Right. Would that avoid infringement? We'd have to look at that and talk about whether there's a likelihood of confusion. There's a likelihood of confusion as a whole separate... Let me tell you where I'm going with this. Sure. You're pointing to very specific features that you say are trivial. Some of them are very subtle in the context of an item which looks to be about a half an inch tall. Right. A little bit more. A little bit more. All right. My concern is that as specific as you are being with respect to these various design distinctions, if you get the mark, are you going to basically be saying, well, those distinctions are really so trivial that a person looking at this thing from a couple of feet away would not notice the differences, and therefore our mark is entitled to predominate over somebody who has different shaped ridges, for example. Yeah, that's a great question. Here's what I'm getting at. Human beings are very good at recognizing these patterns. It's a combination of patterns. Particularly if the human being in question is somebody who draws blood all day for a living. People who work in a hospital or a medical office use these things hundreds of times a day, hundreds of times a week, thousands of times a year. They get to recognize this pattern. What human beings are not good at is distinguishing a pattern like this that they're familiar with from a counterfeit. We're concerned about counterfeits, exact copies. This is a medical product. It's not just a tube. Inside this is a preservative, which helps keep the sample preserved for medical testing. There's a vacuum in here. The product doesn't work well if the vacuum is not a strong vacuum. The product has to be sterile inside. These are all important quality issues that my client has to worry about that a counterfeiter would not have to worry about. We are very concerned about exact copies coming in that mimic the exact shape that even a user who's familiar with the design can't tell the difference. The quality may be totally different. That would obviously have an effect on the results of medical tests. It would have an effect on people's health and safety. That's what we're concerned about. If someone didn't have the exact copy but had the rounded top instead of the spires, you'd still be concerned. We would be. We'd have an analysis of whether there's a likelihood of confusion. The primary concern is counterfeits. That's why this is a very modest registration we're seeking. We just want to protect this particular design. We're not trying to... Why don't you... That's the question, really. You're saying you're only protecting this particular design. My question is in light of the fact that each of these distinctions is, with perhaps the exception of the hole in the top, which is, I gather, the closest to being purely functional of the various features. These are pretty subtle points. I'm just wondering if the effect of registering this mark would be to give you a much broader protection than the particular designated points of, for lack of a better term, quality. Let me say two things about that, too. Can I? If what you were really trying to protect were certain, say, were the spires, then why don't you file the application and dot, dot, dot everything except the spires? Well, it's not the spires. It's a whole combination. But if I could just come back to the... Wait, wait, wait. I mean, the problem is viewing the mark as a whole, the top begins to count very heavily against you because the top is very visible. It's functional. And it's not dot, dot, and so it's clean. The little thumb thing along the bottom is also, appears to be functional. So the board is looking at the mark as a whole, and there's a lot of it that's functional. Well, it's a combination of... But what I'm saying is, if you had really desired to protect just only a piece of what's in there, if you had dot, dot, dotted everything else, then the top and the bottom wouldn't count against you when you're trying to assess the whole. Get my point? Yes, but it's more than just the spires. The rubies could have gone from here all the way to the top. They didn't. The designer chose to have them stop about three-quarters of the way. The top of the cap could have been flat, it could have been convex, it could have been domed, it could have had sloped sides like in one of the patents. He designed it with this combination of things, not just the spires, but this whole combination. My point is that you're combining it with something that is obviously or is admittedly functional. Well, you're talking about... I mean, what would happen if you're not dissecting the mark, but you're looking at the mark in terms of saying, well, it's got five pieces. Right. And out of the five pieces, seven of them are functional, and three are not. Well, I would say... No, just say, what would the answer be in that case? I would say they're not functional. The overall combination... I'm just asking you as a hypothetical, what would happen if we counted up... The parts actually have numbers on them, okay? And if we counted them up and we said, well, there are ten parts and seven of them are functional and three are designed, what's the answer in terms of whether or not, as a whole, the mark is functional? One, I don't agree that some of these... These are all non-functional. Is that the answer to my question, or no? It's a combination. It's a hypothetical. It's a combination. It's a combination. I would say the combination. It's a combination that's protectable because, as a whole, this... But can the combination be patentable if seven parts of a ten-part combination are functional? If the non-functional features could be registered, then whatever non-functional features of appearance there... Well, you're not trying to register the individual features. You're registering the combination containing features that are functional and non-functional. As I understand it. No. We're not trying to register anything that's functional. We're trying to... But you haven't dotted things that are functional. The cap itself is functional. Well, but we're not claiming that the cap... We're not trying to register the cap itself. We're not trying to... How about the lid? The top part with the hole? Oh, the opening? Well, two things I would say about that. One is that the specific proportions are part of our design. And second, the examiner herself, when she reviewed this application, didn't say that the opening should be in dotted lines. Well, that came up in the board after she briefed. But we could have gone back, and she mentioned that in the examination process, we could have gone back and put the opening in dotted lines. Oh, you did. She did. But isn't your point that an opening to facilitate the insertion of a needle is certainly functional? But that doesn't mean that the opening has to be round as shown. Exactly. It could be triangular. It could be square. It could be wider. The fact that it's circular is entirely ornamental. Is that your argument? No, the proportions. I wouldn't go that far, but I'd say the proportions of this opening, how wide the slip is and how narrow it is, how thick the plastic is, that's part of our design. Well, let me... I can return to what's bothering me here. And maybe I shouldn't be this concerned about this. But if you turn to page 28 of your brief, you have the vacuette closure cap next to your mark. Now, there are some differences, obviously. Would you say that the vacuette, if you were entitled to rights to this mark, that the vacuette would infringe? No. No? No. No, it's different. First of all, it has a different pattern. It's shorter and squatter. It has a different pattern of ridges. It has that black insert and a contrasting material. Well, the color of the insert strikes me as... That can't be a distinction because your design doesn't have colors. Yeah, but ours is all one piece. This is just one piece. Theirs has a plastic insert. It's a different material. It's a different piece. It's a two-piece cap. But in general, the answer to your question, Judge Bryson, is that this came up in the Qualitex case where they were trying to protect the color of the press pads. Right. And the government said, the other side said, that if we give protection to this particular green-gold color, we're going to run into the same problem. Which colors infringe this color? And the Supreme Court said, that's what courts do. Courts decide closed questions all the time. And if a competitor has a similar cap and we sue them and they say it's not likely to be confused, that's what the court will decide. That was the exact argument that came up in the Qualitex case. So let me talk about the utility patents. You are into your rebuttal time. So you can say that if you like. Okay. We've asked you a lot of questions, so we'll restore your full rebuttal time. Let's see. Is Heber? Is that the right pronunciation of your name? Heber. Yeah. May I please report? Judge Bryson, you asked a lot of good questions about really what it would mean if they get a registration for this design. And it does give them protection in this entire design. And the examining attorney felt, and the board agreed, that the entire design is functional. They looked at what the influence of the features were in the overall design and correctly pointed out that this top portion and the ridges themselves are part of the design, as is the lower flange lip. And all of those features, the evidence shows, are clearly functional and utilitarian. If ridges are functional, and I don't think anybody here is debating that, that doesn't necessarily mean that these particular ridges and the way they look are functional. Isn't that right? I think that could be right. And we are definitely not trying to say that per se any pattern of ridges on a cap would be functional. Is the spire, the pointed top of the ridge, is that functional? That, I think even the board agreed, was a decorative feature. But it doesn't detract from the function of the ridges. The answer is no, it's not functional. I would say no, having a spired tip is not functional. Same thing with the shape of the opening at the top. The fact that the opening is there is functional, but the fact that it's circular with those proportions as opposed to square or triangular or star-shaped is ornamental, is it not? There I would disagree that that's purely ornamental. That clearly has some function, the round and the overhang, because we only look at their advertising and the patents confirm this. But if I can take you to A462, where the advertising is speaking about this shield, this cap, this is what they're trying to protect, this outer portion. Purely in terms of its utility and the advantages that it provides in terms of enhanced handling features that are inherent in the design. And it speaks to the ridges that provide a more secure grip. It speaks to how it encourages safer opening. That's the bottom flange part that prevents the use of... Correct, you can't flick it off with your thumb. It makes it better. And that the hooded feature reduces the ability to get your glove caught. But all of those features would be the same if the cap had a different pattern of ridges, if it had a different kind of opening. Isn't that right? So it seems to me that those various... the particular type of ridges and the particular pattern of ridges and the particular shape of the ridges is not dictated by function, but dictated by ornamentation. Isn't that true? Well, the ridges themselves aid in gripping. That's clear. Any ridge would do that. Any ridge, and the patent confirms, and the part that the board pointed to in their 446 patent is that A88, that it's a vertically spaced or conferentially spaced around the cap ridges. And really, that covers any of these patterns. They have an open space and they have groupings of ridges. And as Judge Bryson pointed out, the vacuette cap that's in their brief at page 828 has that same pattern. It tends to show that these are adopted because of their utility, not because of their ornamentation. And the same thing with the opening in the cap, which is mentioned in the patent specifically. It needs to have a needle go into it, and perhaps, last I checked, I mean, now this is admittedly not in the record, but needles generally are round as they go in, and perhaps that's why the cap needs to be round. It also speaks to how it reduces blood splatter and makes it much safer. So overall, this cap makes it safer to handle. The lab technicians can be more at ease that they're not going to have blood splatter because of the features in the shield. You mean it would not be quite as easy if the opening at the top was square? I think that perhaps you could have more blood splatter risk then because if it's not meeting the needle in the right way, then when you withdraw it, if it's the square opening, perhaps blood could come out. Isn't our analysis driven by sort of a four-part test? We want to know if there are any utility patents out there and what they teach, and then we want to look at advertisements, et cetera? Correct. On the terms of the utility patents, what do we do with the fact that we've got three design patents here? Well, first I would point out they don't have a design patent for this exact design. They have design patents for other designs, but even this court's... Well, but I mean the other designs show ribs and show this sort of thing, right? So your argument on the utility patent is it shows the ribs, any ribs, no matter how it's designed will be functional. You just said that a minute ago in the teaching from the utility patents, right? Mm-hmm. So if we go to design patents, and they obviously got a design patent on something that you say is functional. Well, they got a design patent on the whole assembly, and design patents... Now, I'm not an expert in design patent examination. I did read the MPEP Chapter 1500 on design patents, and it does seem that they undergo a different examination than what we do on the trademark side. Yes, the question is... They're no less entitled to a presumption of validity. And that's absolutely correct. They're not, but they can't trump what's in a utility patent, for example. They are evidence, but they are not dispositive evidence. And when you have other evidence in the record that so clearly shows the functions we do here, in particular their advertising and the way they chose to promote the features of the... Well, is the effect of the design patents in this case to neuter the effect of the utility patents? I don't think it does, but if the court thinks that it does, it certainly doesn't neuter the effect of the advertising. Can you think of a previous case in which there have been both design patents and utility patents with respect to a mark that's in question? I'm not remembering the outcome of the R.M. Smith case, but that, I believe, was the case where the court expressed that a design patent, while it certainly can be relevant and probative, can be outweighed by other evidence of functionality. I don't remember the exact outcome in that case. But in that case, you didn't have both design patents and utility patents in suit? I'm not sure if there was a utility patent in that suit. But I would point out, too, that Morton Norwich is asking about the types of evidence that are probative on functionality, and it talks about utility patents. And the Supreme Court in traffic clearly expressed that utility patents can be the most significant evidence. So I don't think it's fair to say that design patents... I gather the question is not under the press, and the question is not what the utility patent claims, but what it teaches? Correct. And traffic's confirmed that what it teaches is equally as relevant as what it claims. I'm having difficulty applying the broad language that comes to us from the cases on this kind of a case, and I would like some help from you. The board cited at page 9 of its opinion the proposition that it's not necessary that all features of our product or packaging configuration mark be functional, that the mark can contain arbitrary or otherwise non-functional features, but it's nonetheless functional if the overall design is functional. Now, I don't understand really what that means, because suppose you had this cap, and you had on one side of the letters B, D, in letters that were as large as would be permitted on the cap. Well, the overall cap, of course, would be functional, one could barely say, but I would think those letters would be enough to entitle the overall design to protection, wouldn't you? It might be, yeah. So I'm not sure how we go about analyzing whether the, quote, overall design is functional, where you have particular aspects of the design that are part of functional features, but are themselves, those aspects, such as the spires, that are clearly not contributing to function and are at least arguably arbitrary choices, choices to make triangular shapes at the top of the ridges as opposed to round ones. How do we go about deciding whether that is enough to convert a generally utilitarian device into a design that's protected or protectable? Well, it's a very good question. I think it's... It's all very well simply to have language like this from the cases, and we've been guilty of using that language and they'd say, okay, we're done. But we have to apply it in a particular case, and I'm having trouble going from the broad language to the application. But this is really no different than what the test for really analyzing any trademark is. It's perfectly appropriate. You have to look at what is the overall impression, okay? And here, what are the most influential features? The board found it was not the little tips at the top or perhaps maybe the fatter lip, which you can't really necessarily see in the drawing. They found that it's that prominent opening at the top that's clearly functional. The ribs are clearly functional at the bottom. And overall, the way they influence what your overall takeaway is from that mark is function. Sure, there are some aspects that are ornamental, and we don't dispute that, and the board agreed. The triangular tips, as Your Honor points out, those are not. But can they alone carry the day when you're looking at the overall article? And let's not forget what they are seeking to register it for. They're seeking to register it for closure caps, the thing itself. And in addition, when you are looking for really what is the mark, you have to look at what the whole thing conveys. And the board here found the whole thing overall. You can't separate these ornamental features that are more subtle than these larger features that are clearly functional. And at the end of the day, they found it functional. Now, if they wanted to protect simply the ornamental features, they could have done so. They could have lined out things. But I do submit that in this case, it would be difficult to separate out just purely ornamental features and get protection. Let's take the top, which is a very conspicuous feature of this design. A round hole in the top of the cap leading to the stopper and allowing access to a needle I take. Now, if that... I mean, there are reasons that people make holes round. I mean, there's a reason that, for example, manhole covers are not triangular. So round is a fairly natural and geometrically useful shape. OK, but suppose that this design had a triangular hole. Now, it would be functional in that that is still a hole that's for the purpose of needles, but you wouldn't argue, would you, that the choice of a triangle would not be protectable because the hole is functional? I think if they put in evidence in the record that explained that the triangle was decorative and no one else had triangles, that could be compelling. Perhaps the initial functionality refusal would issue just based on what is seen, that, yes, it's an opening that provides function. But I think that could be rebutted. Here, it can't be. Their patent specifically speaks about the circular opening in the top, and the advertising confirms it. And you look at the asserted alternative designs, they all have circular openings in the top. So it's not a situation... Does the advertising allude to the benefits of a circular opening? I'm sorry, what? Does the advertising allude to the benefits of the circular opening? I didn't remember that. I think one of them did speak to it. The one that I pointed to, I'm not sure... I believe it does in the sense that it's reducing blood splatter, but it does not reference it in terms of the circularity. No, it does not. The patent does reference it in terms of the circular opening. The patent does. The patent does. The advertising, the one that I pointed to, does not reference specifically the circular opening. But I do think that there could be a shape that is not functional at the top. We just don't have that here. And I take it, although the board didn't say this explicitly, but I take it that the fact that this is very small, and therefore some of these particularly small features would be difficult for at least a casual observer. I mean, your opposing counsel says these people who buy these things are not casual observers, and that may well be true. But the dimension matters, I take it, in the analysis of whether these features are protectable. Or does it? Maybe I'm wrong. I think you have to take that into consideration. I don't think at all that the board was saying there's some too small rule, that if it's small, you can't have protectable features. That's not it. But it is, as Your Honor points out, it's what is the impression of this mark? What do you see when you look at it? And even if you look at their customer declarations, they're not saying that they can distinguish this from the other cap, this evacuate cap, based on necessarily the shape of the ridges. They say, oh, the ridges are more pronounced, or the cap is longer. And so I would submit that those types of things that they don't make the impact on you when you look at it, it really doesn't matter what the size of the object is, but you have to look at what are the features that make the most impact overall, that really dominate the overall impression that is conveyed by this design. And it's not those tests. Thank you, Ms. Heumann. Mr. Lutz, three minutes. A couple points. In terms of our advertising, the benefits that my client's advertising touts are not in the designs we're trying to protect. What they're doing is talking about the advantages of this cap configuration, in comparison to the prior thing, just a tube with a stopper in it. If you look at 194 of the appendix, it says superior performance when compared to rubber stopper tubes. All they're saying is that the idea of a cap that has a shield and a stopper inside is better than the old-fashioned tube with a plain stopper inside. They're not saying these particular design elements are better than other competing design elements once you've got a cap that has a shield design. All they're saying here is what's obvious in that is this kind of cap design, whether it's our brand or somebody else's brand, is better than a traditional cork inside a tube. That's the benefit that we're touting. We're not saying, there's no ad that touts this particular design that we're trying to register as being functionally better than some other design for a shield-type cap. Doesn't that page at this point talk about the thumb aspect? Sure, that's true. This is the old-fashioned kind. You could flip it. This is one of the alternative designs. This is the old-fashioned kind. You could, if you wanted to, just flip it off with your thumb. Insofar as the design deals with this thumb feature, the advertisement does tout that. Right, right. But that's true of any cap and shield design. But the particular design elements, what we talked about before, the length of the ridges and whether the ridges are triangular. I was just going to that part down the bottom, which is the thumb off. Well, no, that's the shield aspect of it. There's a stopper inside, and because it has a plastic shield that goes over the top of the cap, it's harder to just use your thumb to flip it off. But we're not trying to protect that as a trademark. That's where the... Aren't you trying to protect the design at the bottom there? Oh, sure, but that's only the specific, these two elements of the design where it's got a flat band and then a curved lip. This one doesn't have that. This one just has a flat bottom. That's an alternative design. It doesn't have to have that curve at the bottom. So that's all we're saying there. And in terms of the opening at the top, the design patents show caps that have a round opening. We were given design patent protection for that. So it can't be that the round opening at the top precludes us from getting protection. In terms of the utility patents, the utility patents mention that the outer surface of the cap has ridges, but it doesn't show any particular design of ridges. And the cases say where the utility patent don't disclose the particular design you're trying to protect as a trademark, they're not relevant. They don't show function. Do the utility patents reference the round hole in the top? Yeah, they do show a cap with a round hole, but they don't claim that as part of the invention. The inventions are all related. Benefits in collection, though? Of a round opening as opposed to some other shape? As opposed to a triangular opening. No, they don't talk about that. The way it just fits in, this is where the needle goes. This is the needle hole. The needle goes on here. That goes in your arm. And then the cap goes in there. So you can see it just fits in like that. That's all. That's just an opening for the needle to go into. But nobody says that a round hole is. Is it your position that there was no evidence to support the board's conclusion that you failed to preponderate? The board was looking at the wrong thing in terms. Their error was they were looking at the wrong thing in terms of what we were trying to protect. We're not trying to protect a cap that has a shield. And then are you saying they dissected the mark? They looked at the wrong elements of what we're trying to protect. So that was their error. There is no evidence. What was it they looked at that they shouldn't have looked at? Be specific. Which piece of the mark did they look at that they shouldn't have? They didn't look at the mark. They said they did. Yes, but that was their error. They were looking at the idea of a cap that has a shield and a stopper inside. I'm sorry. How do we know that? Well, because where in their opinion did they tell us that they were making this up? Where specifically did they talk about that? Well, it's the quote that Judge Bryson just read. I think it was on page nine of the decision. You don't take issue with the general proposition that they articulate in that quote, do you? I think they stopped reading. They got that from Textron. They stopped reading too early. The Textron case says what they say there about the overall configuration. But then the Textron case goes on to say, in cases where the holders of such designs seek trademark protection, it can be obtained only for those features that are non-functional. So you can have protection for features of a product, but only those that are non-functional. And what we're saying, and you have to read that in conjunction with the famous quote from Morton Norwich, that functionality is always in relation to the design of the product, not the product itself. We're trying to protect you as well. Thank you. And we thank both counsel. The case is submitted.